## AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR A SEARCH WARRANT

I, Task Force Officer Douglas Ruth, Drug Enforcement Administration, being duly sworn, depose and state as follows:

## AGENT BACKGROUND

1. I am a Police Officer for the town of Hampton, New Hampshire, and have been so employed since June 2009. Since August 2012, I have held the rank of Detective. Since August 2015, I have been assigned as a Task Force Officer ("TFO") with the United States Drug Enforcement Administration ("DEA") in Portsmouth, New Hampshire. I am a "federal law enforcement officer" as defined in Rule 41(a)(2)(C) of the Federal Rules of Criminal Procedure, that is, a government agent who is engaged in enforcing the criminal laws of the United States and within a category of officers authorized by the Attorney General to request a search warrant.

2. I have received training regarding narcotics investigations while attending the 150th New Hampshire Police Standards and Training Police Academy and have attended additional specialized training courses in furtherance of my past and current assignments.

3. I have participated in all aspects of drug investigations, including physical surveillance, surveillance of undercover transactions, acting in an undercover capacity, the introduction of undercover agents, the execution of search warrants, the effecting of arrests, and debriefings of defendants, informants, and witnesses who had personal knowledge regarding major narcotics trafficking organizations. I have also reviewed recorded conversations and telephone, financial, and drug records. Through my training and experience, I have become familiar with the manner in which illegal drugs are imported, transported, stored, and distributed, and the methods of payment for such drugs. I have also become familiar with the manner in which narcotics

organizations utilize various forms of violence and intimidation in furtherance of their narcotics trafficking activity, to protect their operations, members, narcotics, and narcotics proceeds.

4. Based on my training and experience, I am familiar with the methods of operation employed by drug traffickers operating at the local, statewide, national, and international levels, including those involving the distribution, storage, and transportation of controlled substances and the collection of money that constitutes the proceeds of drug-trafficking activities. Specifically, I am familiar with the manner in which drug traffickers use vehicles, common carriers, mail and private delivery services, and a variety of other means to transport and distribute narcotics and the proceeds of narcotics trafficking. I am familiar with the manner in which drug traffickers often store drugs and drug proceeds in storage sites commonly referred to as "stash houses."

5. Based on my training and experience, I am aware that drug traffickers commonly use cellular telephones to communicate and further their drug-trafficking activities. However, drug traffickers are aware of law enforcement's use of electronic surveillance, and thus frequently endeavor to thwart detection by changing cellular telephone numbers, using multiple cellular phones at the same time, and/or utilizing prepaid cellular phones where the user of the phone is not required to provide personal identifying information. I am also aware that drug traffickers frequently "drop" or change cellular telephone numbers and cellular telephones in an effort to thwart law enforcement's use of electronic surveillance. I am familiar with the manner in which narcotics traffickers use coded, veiled, or slang-filled language in telephone conversations when discussing their illegal business, in an effort to further prevent detection, and that they often use text messages in lieu of phone calls to avoid speaking over the telephone. I am familiar with the "street" language used by drug traffickers, as well as the methods they use to disguise conversations and operations.

**PURPOSE OF AFFIDAVIT**

6. I submit this affidavit in support of an application for a warrant to search two Samsung cellular phones seized from 478 Riverside Drive, Apartment 204, in Lawrence, Massachusetts on March 14, 2024, which are presently secured in the temporary non-drug evidence vault at the Portsmouth Tactical Diversion Squad (PTDS) DEA Office in Portsmouth, New Hampshire. The phones, described fully in Attachment A, are a black Samsung cell phone bearing call number (929) 426-5540 and a black Samsung cell phone bearing call number (978) 943-2361 (collectively, the "**Subject Devices**"). The **Subject Devices** were located with and seized from Jose Luis Guerrero Nunez at the time of his arrest on a federal warrant.

7. Based on the information contained herein, there is probable cause to believe that the **Subject Devices** contain evidence, further described in Attachment B, of criminal offenses in violation of 21 U.S.C. §§ 841(a)(1) and 846 (Distribution of and Possession with Intent to Distribute Controlled Substances, and Conspiracy to Distribute and Possess with Intent to Distribute Controlled Substances (the "**Target Offenses**")).

8. The information set forth in this affidavit is based on my personal participation in this investigation, as well as my training and experience, and information received from other law enforcement officers. I have not set forth every detail I or other law enforcement officers know about this investigation but have set forth facts that I believe are sufficient to evaluate probable cause as it relates to the issuance of the requested warrant.

**PROBABLE CAUSE**

9. The DEA, with assistance from the Seabrook and Hampton, New Hampshire Police Departments, is conducting a criminal investigation of "ERIK" (identified through the investigation as Jose Luis Guerrero Nunez), Carlos Alejandro Chevalier Santos, Eddy Mendez

Carmona, Juan Carlos De Los Santos Romero, and others known and unknown regarding their commission of the **Target Offenses** involving the distribution of fentanyl, methamphetamine, and counterfeit pills. Investigators identified a source of supply who refers to himself as "ERIK" and utilizes phone numbers (929) 426-5540 (the "5540 Number") and (978) 943-2361 (the "2361 Number"). During the investigation, authorities utilized undercover officers to conduct drug purchases from this drug trafficking organization ("DTO"). For each of the undercover buys, the transactions were arranged through law enforcement by contacting either the 5540 Number or the 2361 Number. Several of these undercover drug transactions are outlined in the following paragraphs.

10. On or about November 17, 2023, an undercover officer ("UC-1") contacted "ERIK" at the 5540 Number to arrange the purchase of an ounce of crystal methamphetamine for $350. UC-1 arranged with "ERIK" to meet at the Walmart located at 700 Lafayette Road in Seabrook, New Hampshire. "ERIK" texted UC-1 from the 5540 Number stating, "He be here in 2 minutes." Minutes later, investigators observed a red Toyota Corolla known by investigators to be used by the DTO park in the Walmart parking lot. "ERIK" texted UC-1 from the 5540 Number to go into Walmart's bathroom for the transaction.

11. Inside the bathroom, UC-1 met with De Los Santos Romero and Luis Guerrero Cabral.[1] UC-1 provided De Los Santos Romero with $350 in official authorized funds ("OAF") and in return, De Los Santos Romero provided UC-1 with a small package wrapped in clear plastic wrap that contained a white, crystalized substance that is consistent in appearance with and is suspected of being methamphetamine.[2]

---

[1] Investigators identified De Los Santos Romero through his driver's license photograph. Investigators identified Guerrero Cabral through motor vehicle stops.

[2] The UC transactions described in this affidavit have all been audio and/or video recorded.

4

12. UC-1 explained to De Los Santos Romero and Guerrero Cabral that he would be getting more money and would need more drugs that same day. Guerrero Cabral informed UC-1 that they did not have more drugs and told UC-1 to contact "the phone," which UC-1 understood to mean the 5540 Number he had been using to communicate with "ERIK." At approximately 12:20 p.m., UC-1 sent the following text message to "ERIK" at the 5540 Number: "My boy just hit me up with more money. Your boys said they don't have any with them. Can I get another ounce and 2 stikes [sic]³...I'm going to go grab the money now." "ERIK" responded, "ok...let me know when you are ready."

13. Approximately 11 minutes after this text message exchange between UC-1 and "ERIK," investigators conducting surveillance at the DTO's suspected stash house—30 Danbury Drive in Methuen, Massachusetts—observed Eddy Mendez Carmona driving a 2008 black Volvo XC80 (the "Volvo") bearing Massachusetts registration 4SVY68, registered to Eddy Mendez Carmona, leave the Danbury Drive parking lot.⁴ Approximately 30 minutes later, investigators observed Mendez Carmona, driving the Volvo, enter the same Walmart parking lot discussed above. At or around the same time, "ERIK" texted UC-1 from the 5540 Number, "In [sic] here." UC-1 again entered the Walmart bathroom, this time meeting Mendez Carmona. UC-1 provided Mendez Carmona with $650 in OAF and in return, Mendez Carmona provided UC-1 with a small package wrapped in clear plastic wrap that contained a white, crystalized substance that is consistent in appearance with methamphetamine, and two pressed cylinders containing a brownish/white powder that is consistent in appearance with fentanyl. The DEA Laboratory later tested the substances and confirmed them to be methamphetamine and fentanyl.

---

³ UC-1 was referring to "sticks," which is a street term for a 10-gram package of fentanyl.
⁴ Investigators identified Mendez Carmona through his driver's license photograph.

14. Between December 12, 2023 and December 18, 2023, UC-1 exchanged text messages with "ERIK" at the 5540 Number. In these text message exchanges, UC-1 arranged for the purchase of fentanyl and methamphetamine to take place on December 18, 2023 at the same Walmart discussed above.

15. On December 18, 2023, at approximately 12:05 p.m., UC-1 texted "ERIK" at the 5540 Number indicating UC-1 was at the Walmart. At approximately 12:21 p.m., Methuen, Massachusetts Police Detectives observed De Los Santos Romero and Carlos Alejandro Chevalier Santos leave the parking lot adjacent to 30 Danbury Drive in a gray Jeep Liberty (the "Jeep Liberty") bearing Massachusetts registration 4AGC47, registered to Carlos Alejandro Chevalier Santos, and travel north. Detectives observed the Jeep Liberty spin out and have a minor accident on Route 495, and at approximately 12:46 p.m., "ERIK" texted UC-1 from the 5540 Number, "The street is very bad, they had an accident." At approximately 12:49 p.m., agents observed the Jeep Liberty arrive at, and De Los Santos Romero enter, the Walmart.

16. UC-1 then entered the Walmart bathroom and met with De Los Santos Romero, who provided UC-1 with a crystal-like substance believed to be methamphetamine and seven pressed cylinders containing a substance believed to be fentanyl in exchange for $1,200 OAF. The substances were later tested at the DEA Laboratory and tested positive for methamphetamine and fentanyl.

17. In the days leading up to January 3, 2024, UC-1 arranged with "ERIK," using the 5540 Number, for a second undercover officer ("UC-2") to purchase ten grams of fentanyl for $400 as well as a sample of various other narcotics. UC-1 and "ERIK" agreed that UC-2 would go to the New Hampshire Liquor & Wine Outlet located at 605 US-1 BYP South in Portsmouth, NH for the drug transaction.

18. At approximately 1:11 p.m. on January 3, 2024, Methuen, Massachusetts Detectives observed Chevalier Santos enter a 2012 black Acura TL (the "Acura TL") bearing Massachusetts registration 5MEG28, registered to Juan Carlos De Los Santos Romero, leave the parking lot of Danbury Drive and travel north on Route 495. At approximately 1:40 p.m., UC-2 arrived at the meeting location, and at approximately 1:42 p.m., agents observed the Acura TL also arrive at the meeting location. At approximately 1:51 p.m., Chevalier Santos entered the undercover vehicle and met with UC-2.

19. Inside the undercover vehicle, Chevalier Santos provided UC-2 with various substances – a crystal substance, two white hard substances, a white powdery substance, brown cylindrical pressed power, and blue pills stamped with "M" and "30" – consistent in appearance with fentanyl, methamphetamine, crack cocaine, cocaine, and oxycodone pills, in exchange for $400 OAF. The substances were later sent to the DEA Laboratory. The crystal substance tested positive for methamphetamine hydrochloride; one of the white hard substances contained fentanyl, tramadol, and cocaine; the other white hard substance contained cocaine base; the white powdery substance contained cocaine hydrochloride; the brown cylindrical pressed powder contained fentanyl and tramadol; and the blue pills stamped with "M" and "30" contained fentanyl and acetaminophen.

20. In the days following this transaction, UC-2 contacted the 5540 Number and discussed arrangements for an in-person meeting between UC-2 and "Erik" to discuss future drug transactions. On January 24, 2024, UC-2 and "Erik" agreed to meet later that afternoon at a bar in Portsmouth, New Hampshire. Investigators set up surveillance both inside and outside the agreed meeting location. At approximately 1:55 p.m., investigators observed a 2014 red Jeep Grand Cherokee (registered to Mirtha LARA LARA of 478 Riverside Dr. Apt. 204, Lawrence

MA), arrive at the meeting location. Investigators observed Chevalier Santos and another Hispanic adult male, who surveillance agents both inside and outside the bar recognized from a previous drug investigation as Guerrero Nunez, exit the Jeep and enter the bar.

21. Upon entering the bar, Guerrero Nunez sat down beside UC-2, while Chevalier Santos took a seat on the other side of Guerrero Nunez. During the meeting, which lasted approximately forty minutes, Guerrero Nunez and UC-2 discussed future drug transactions. Chevalier Santos did not take part in the discussion. While UC-2 was meeting with Guerrero Nunez and Chevalier Santos, investigators called the 5540 Number. At the same time, surveillance agents monitoring the meeting heard a phone ringing and observed Guerrero Nunez reach in his pocket and appear to silence the incoming call.

22. As the meeting between UC-2 and Guerrero Nunez was concluding, Guerrero Nunez told UC-2 that he would provide UC-2 with a new phone number to use to contact him for future drug transactions. At approximately 2:37pm, after discussing various drug activity, Guerrero Nunez and Chevalier Santos left the bar and returned to the Jeep Cherokee and left the area.

23. At approximately 2:54 p.m., Trooper Berky of the New Hampshire State Police (NSHP) conducted a motor vehicle stop of the Jeep Grand Cherokee on Interstate 95 (south) at mile marker 2.8 in Hampton Falls, NH. The driver provided a Dominican Republic license as Carlos Alejandro Chevalier Santos and the passenger provided a Dominican Republic license as Jose Luis Guerrero Nunez.

24. On January 24, 2024 at approximately 4:57 p.m., UC-2 received a text message from the 2361 Number that stated, "Hey brother mi new number Erick." The UC understood that this was Guerrero Nunez's new phone number.

8

25. In the days leading up to February 1, 2024, UC-1 arranged with "ERIK," using the 2361 Number, for UC-2 to purchase 100 grams of fentanyl and one pound of methamphetamine for $4,500 at the same New Hampshire Liquor & Wine Outlet located at 605 US-1 BYP South in Portsmouth, NH.

26. On February 1, 2024, at approximately 12:55 p.m., Methuen, Massachusetts Detectives observed Chevalier Santos enter a 2006 gray Dodge Charger (the "Dodge Charger") bearing Massachusetts registration 5LBW18, registered to Carlos Alejandro Chevalier Santos, leave Danbury Drive and travel north on Route 495. The surveillance team lost sight of the Dodge Charger as it traveled into Lawrence, Massachusetts. At approximately 1:25 p.m., investigators located the Dodge Charger as it continued traveling north on Route 495. At approximately 1:43 p.m., agents observed the Dodge Charger arrive at the meeting location and park near the undercover vehicle. Agents then observed Chevalier Santos exit the Dodge Charger, walk to the front of the vehicle, open the hood of the Dodge Charger, and retrieve something from the engine compartment before entering the passenger side of the undercover vehicle.

27. Inside the undercover vehicle, Chevalier Santos provided UC-2 with a crystal-like substance believed to be methamphetamine and a white hard substance believed to be fentanyl in exchange for $4,500 of OAF. UC-2 and Chevalier Santos then left the area. UC-2 observed Chevalier Santos as the sole occupant of the Dodge Charger. The DEA Laboratory later determined that the crystal substance contained methamphetamine hydrochloride and the white hard substance contained fentanyl.

28. On March 6, 2024, UC-1 exchanged text messages with "ERIK" at the 5540 Number and arranged a purchase of sixty grams of fentanyl for $1,000 to take place at the Walmart located at 700 Lafayette Rd. in Seabrook, New Hampshire.

29. At approximately 2:55 p.m., investigators observed Chevalier Santos exit the front common door of 30 Danbury Drive, get into the Volvo, and leave Danbury Drive. Investigators were unable to maintain sight of the Volvo for the entire drive; however, at approximately 3:49 p.m., the Volvo arrived at the agreed meeting location.

30. Investigators observed Chevalier Santos enter the Walmart and walk towards the bathroom. UC-1, while standing inside a handicap stall in the bathroom with the stall door open, observed Chevalier Santos enter the bathroom and go into a stall adjacent to the handicap stall. Chevalier Santos then exited the stall and made eye contact with UC-1, who was still standing in the handicap stall with the door open. UC-1 observed Chevalier Santos return to the adjacent bathroom stall, reach under the stall divider, and open his hand, showing that it contained six cylinder-shaped pressed powder packages wrapped together in clear plastic wrap. UC-1 gave Chevalier Santos $1,000 of OAF in exchange for the substance, suspected to be fentanyl. Investigators later used a TruNarc Detection Device on the substance, which returned a presumptive positive result for fentanyl.

31. On March 13, 2024, Guerrero Nunez, Chevalier Santos, Mendez Carmona, De Los Santos Romero, and Luis Guerrero Cabral were indicted for conspiracy to distribute and to possess with intent to distribute controlled substances.

32. In the days leading up to March 14, 2024, UC-1 arranged with "ERIK," using the 2361 Number, for UC-2 to purchase one (1) kilogram of fentanyl and three (3) pounds of methamphetamine for $30,000 at the New Hampshire Liquor & Wine Outlet located at 605 US-1 BYP South in Portsmouth, NH.

33. On March 14, 2024, at approximately 11:39 a.m., investigators observed a 2001 gray Toyota Rav4 (the "Toyota Rav4") bearing Massachusetts registration 3LPY88, registered to

10

Jose Peguero Guzman, occupied by an unknown Hispanic male arrive at the meeting location. Approximately two minutes later, investigators observed the Volvo, occupied by Chevalier Santos, arrive at the meeting location. At 11:41 a.m., UC-1 received a text message from "ERIK" the 2361 Number, "In [sic] here". The Volvo and Toyota Rav4 parked in different locations. "ERIK" at the 2361 Number texted UC-1 attempting to change the meeting location because they observed members of surveillance. Both the Volvo and Toyota Rav4 left the meeting locations and parked in a nearby business parking lot. UC-1 and "ERIK", at the 2361 Number, exchanged text messages and eventually agreed to meet at the original meeting location. The Volvo then returned and parked near UC-2's vehicle. Investigators observed Chevalier Santos exit the Volvo and enter UC-2's vehicle. Chevalier Santos indicated that he did not have the narcotics and told UC-2 to wait "2 minutes" as he was manipulating his cellular phone. A few moments later, the Toyota Rav4 arrived and parked on the driver's side of UC-2's vehicle. Chevalier Santos exited UC-2's vehicle, opened the passenger door of the Toyota Rav4 and removed a brown bag from the passenger side floor and returned to UC-2's vehicle. Chevalier Santos then opened the brown bag and other packaging and showed UC-2 the narcotics. Members of law enforcement then arrested Chevalier Santos on the indictment and Portsmouth, NH Police arrested Peguero Guzman for a state charge of possession of controlled drugs. At 12:17 p.m., "ERIK", at the 2361 Number, attempted to call UC-1, sent a text message "Hey brother" and at 12:21 p.m. attempted to call UC-1 again.

34. On March 14, 2024, law enforcement went to 478 Riverside Drive, Apartment 204 in Lawrence, Massachusetts, in an effort to locate Guerrero Nunez and arrest him on the indictment.[5] Upon arrival at 478 Riverside, Apartment 204, investigators made contact with an

---

[5] On January 24, 2024, Guerreo Nunez was stopped in in a vehicle registered to Mirtha LARA LARA at 478 Riverside Drive Apartment 204 in Lawrence, MA.

11

adult female investigators recognized as Mirtha LARA LARA.[6] Investigators explained that they had a warrant for Guerrero Nunez's arrest and obtained consent from Mirtha LARA LARA to enter the apartment to look for Guerrero Nunez. Investigators, while searching a bedroom within the apartment, observed two sets of closet doors with one set left open and the other closed. Investigators, while looking through the open closet door, observed a shoulder of an individual attempting to hide from law enforcement. Investigators called the subject out and ultimately located Guerrero Nunez hiding in this bedroom closet within 478 Riverside, Apartment 204. Within arm's reach of Guerrero Nunez on the floor of the same closet, investigators observed two cell phones, one black cell phone in a black case and one black cell phone in a red case. Investigators placed Guerrero Nunez under arrest and secured him in handcuffs. Investigators then dialed the 5540 Number and the 2361 Number. The phones on the closet floor where Guerrero Nunez was found hiding rang in response to these calls. Specifically, the black phone in the black case rang in response to the call placed to the 5540 Number, and the black phone in the red case rang in response to the call placed to the 2361 Number. Investigators seized both phones and secured them in a faraday bag.

35. Based on the above, there is probable cause to believe that the Subject Devices have been used by Guerrero Nunez in furtherance of the Target Offenses and that evidence of violations of the Target Offenses will be found on the Subject Devices.

### Training and Experience Concerning Digital Devices

---

[6] In addition to having a motor vehicle registered at 478 Riverside Drive Apartment 204, investigators are aware that LARA LARA is on federal supervision out of the District of Massachusetts and confirmed with LARA LARA's probation officer that 478 Riverside Drive Apartment 204 is the address where she is supervised.

36. Based on my training and experience, I know that drug traffickers typically use cellular telephones in order to facilitate drug transactions, including to order and take orders for controlled substances or to set up shipments.

37. Individuals involved in the illicit distribution of controlled substances often take or cause to be taken photographs of themselves, their associates, their property and their product and such items can be stored on cell phones.

38. Cellular telephones often contain evidence of drug crimes, such as internet searches for drug-related paraphernalia, addresses and/or telephone numbers of suppliers and customers, as well as incriminating communications via emails, text messages, and/or instant messages. Most cell phones are now capable of performing internet searches and also allow the user to send and receive emails and text messages. Based on my training and experience, I am aware that drug traffickers may use encrypted chat platforms, such as Whatsapp, Textnow, Signal, Facebook Messenger, and Instagram, to communicate with individuals in other countries (often countries that supply controlled substances to the United States) and with individuals who are cautious about law enforcement detection.

39. In addition, applications such as Venmo and Cash App allow people to conduct financial transfers quickly and easily using their cellular telephones, and drug customers may use these methods to pay their sources of supply for drugs.

40. As noted above, drug traffickers commonly communicate using multiple cellular telephones. The numbers assigned to and dialed by particular cellular telephones can themselves be evidence of drug trafficking. Such numbers can confirm the identities of particular speakers and the occurrence of certain events.

41. Based on my training, experience, and information provided by other law enforcement officers, I am aware that many cellular telephones now function essentially as small computers. Such telephones, known as smartphones, have capabilities that include – in addition to those noted above – serving as a digital camera, portable media player, and GPS navigation device, and they allow for the storage of a vast range and amount of electronic data. Examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device.

## **CONCLUSION**

42. For all the reasons set forth above, I submit that there is probable cause to believe that evidence of the violations of 21 U.S.C. §§ 841(a)(1) and 846 (Distribution of Controlled Substances and Possession with Intent to Distribute Controlled Substances, Conspiracy to Distribute and Possess with Intent to Distribute Controlled Substances) will be found by searching the **Subject Devices** described in Attachment A.

Respectfully submitted,

/s/ Douglas Ruth
Douglas Ruth
Task Force Officer
Drug Enforcement Administration

The affiant appeared before me by telephonic conference on this date pursuant to Fed. R. Crim. P. 4.1 and affirmed under oath the content of this affidavit and application.

Date: **Mar 18, 2024**
Time: **4:29 PM, Mar 18, 2024**

Hon. Andrea K. Johnstone
UNITED STATES MAGISTRATE JUDGE

## ATTACHMENT A
### Property to be Searched (collectively, "Subject Devices")

A1.   One black Samsung cell phone in a black case bearing call number (929) 426-5540, seized from 478 Riverside Drive, Apartment 204, Lawrence, Massachusetts, on March 14, 2024, presently secured in the temporary non-drug evidence vault at the Portsmouth Tactical Diversion Squad (PTDS) DEA Office in Portsmouth, New Hampshire.   The following pictures depict Subject Device A1:



A2.   One black Samsung cell phone bearing call number (978) 943-2361, seized from 478 Riverside Drive, Apartment 204, Lawrence, Massachusetts, on March 14, 2024, presently secured in the temporary non-drug evidence vault at the Portsmouth Tactical Diversion Squad (PTDS) DEA Office in Portsmouth, New Hampshire.   The following pictures depict Subject Device A2:



## ATTACHMENT B
### Items to be Seized

From within the Subject Devices, the following records and information from the time period January 1, 2023 through the present:

a. Information associated with drug trafficking, including pay-owe sheets, buyer lists, telephone lists, address books, seller lists, ledgers, records of sales, photos or videos, records of expenditures made to purchase controlled substances, and records of expenditures to purchase products which are used in the distribution of controlled substances;

b. Lists of customers and related identifying information;

c. Types, amounts, and prices of controlled substances trafficked as well as dates, places, and amounts of specific transactions;

d. Any information related to sources of controlled substances (including names, addresses, phone numbers, GPS location, or any other identifying information);

e. Any information involving the travel to obtain controlled substances or the transportation of controlled substances;

f. Information reflecting contact or communication with co-conspirators, the distribution of controlled substances to co-conspirators, and/or the disposition of proceeds of controlled substances (including within messaging applications such as WhatsApp, Snapchat, and Instagram stored on the phone);

g. Bank records, checks, credit card bills, account information, and other financial records (including on financial applications such as Cash App and Venmo);

h. Evidence of user attribution showing who used or owned the devices at the time the things described herein were created, edited, or deleted, such as logs, phonebooks, saved usernames and passwords, documents, and browsing history.